Frank S. TOTH, Plaintiff-Appellee,

v.

UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, and UAW Local No. 723, Defendants-Appellants,

and

Ford Motor Company, Defendant-Appellant.

Nos. 82–1799, 82–1831 and 83–1543.

United States Court of Appeals, Sixth Circuit.

Argued June 11, 1984.

Decided Sept. 11, 1984.

John A. Fillion, Marley S. Weiss (argued), Associate Gen. Counsel, UAW Legal Dept., Detroit, Mich., for defendants-appellants.

William W. Swor (argued), St. Clair Shores, Mich., for plaintiff-appellee.

James C. Curtiss (argued), Diane C. Sendek, Kermit G. Bailer, Ford Motor Company, Dearborn, Mich., for Ford Motor Co.

Before KEITH and MARTIN, Circuit Judges, and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (UAW International) and UAW Local No. 723 (Local 723) have appealed to this Court from a judgment of the Federal District Court for the Eastern District of Michigan, Southern Division, awarding attorneys' fees against them to Frank S. Toth, Plaintiff-Appellee in this action, as the prevailing party in the settlement of two claims he asserted under § 302(a) of the Labor Management Relations Act (Taft-Hartley Act), 29 U.S.C. § 186(a), and § 501(a) of the Labor Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act), 29 U.S.C. § 501(a), respectively. Ford Motor Company (Ford) has appealed although no attorneys' fees were assessed against it, and seeks to review the district court's finding that Toth was the "prevailing party" on the Taft-Hartley Act claim.

This action was commenced when Toth, in 1979, filed three *pro se* actions in the district court, alleging various violations of the above-named acts, as well as the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, by Ford, the unions and certain union officials. These actions were consolidated into a single civil action on August 6, 1979, and after Toth obtained the services of counsel, a second amended complaint was filed on April 10, 1980, containing the two aforementioned claims in Counts II and III. Subsequently, leave was sought (but never obtained) to file a third amended complaint, and then a fourth amended complaint was filed on September 2, 1980.

This last version of Toth's complaint, which omitted the claims stated in the second and third counts of the second amended complaint, was dismissed as to four of its five counts (the fifth count was a state-law defamation claim against a Local 723 official which still remains pending) when the district court granted the defendants' motions for summary judgment on August 26, 1981. Toth then moved for an allowance of attorneys' fees from Ford and the unions, based on an alleged settlement of

Count II of the Second Amended Complaint, and from the unions alone, based on an alleged settlement of Count III of that complaint. This motion was granted by the district court in a memorandum opinion and order, dated August 2, 1982, which awarded $6958.00 in attorneys' fees against the UAW International and Local 723 on a common benefit theory. The award was later reduced to $3637.00 after the unions moved for reconsideration.

The unions assert that the common benefit awards against them were prejudicially erroneous as they were not parties to either the § 302 or § 501 claims, and as no substantial benefit was conferred by Toth's suit upon the unions or their members. We agree that the awards were in error.

For the reasons hereafter stated, we reverse the judgment of the district court awarding attorneys' fees against the unions, and remand for further proceedings not inconsistent with this opinion on the sole remaining claim contained in the fifth count of Toth's Fourth Amended Complaint.

## I.

### Facts

### A.

At all times pertinent to this case, Toth was an employee at Ford's Monroe stamping plant in Michigan, and a member of Local 723. Under the collective bargaining agreement then in force between Ford and the UAW, full-time union representatives were to be paid at the rate they were receiving at the time of election to union office, subject to any subsequent adjustments to that rate. Prior to his election as building chairman (a full-time union office) at the Monroe plant, Ron Halstead had worked the day shift, and thus was not eligible for the 10% premium paid by Ford to the workers on the midnight shift.

However, on April 5, 1977, Toth and another employee (and union member) examined Local 723's financial records, and discovered that Halstead and John Cramer (the alternate building chairman) were in fact receiving the midnight shift premium.

Pursuant to Article VI, Section 10(f) of the then-existing labor contract, the building chairman had the privilege of leaving the plant during working hours, and could "ring" *either* "in" *or* "out" on the time clock during the shift he happened to work. In this way, Halstead and Cramer were able to receive the midnight shift premium by "ringing out" at some point during that shift, even though there might not have been an "in ring" to show that they had worked the entire midnight shift.

In response to this discovery, Toth, on June 2, 1977, filed internal union disciplinary charges against Halstead and Cramer, accusing them of conduct unbecoming a union member in accepting the premium. He also complained of this practice to the UAW International auditing department. After the Local failed to act on these charges, Toth appealed to the International's Executive Board, which denied the appeal on November 7, 1977. He then appealed to the UAW Public Review Board, composed of such learned scholars as then-Dean Theodore J. St. Antoine of the University of Michigan law school. The Public Review Board, however, determined that the International had correctly ruled that the propriety of the premium payments, where Halstead and Cramer had not tried to conceal them, was a matter of contract interpretation for the Local membership, not a proper subject of disciplinary charges. Nothing further happened in this regard until Toth filed suit in 1979.

In Count II of the Second Amended Complaint, Toth alleged that Ford, by paying unauthorized shift premiums to the two union officials, violated 29 U.S.C. § 186(a),[1]

---

**1.** 29 U.S.C. § 186(a) (1982) provides, in pertinent part:

It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, advisor, or

consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

. . . . .

and an injunction against further such payments was sought under section 186(e).[2] On May 1, 1980, Ford (the only defendant named in Count II) moved to dismiss that count, or for summary judgment thereon, attaching an affidavit executed by R.C. Marshall, a Ford supervisor at the Monroe plant, which stated in pertinent part:

2. On or about September 3, 1977, Frank Toth, plaintiff in the above case, complained that Ron Halstead, the Building Chairman, was obtaining a 10% midnight shift premium illegally.

3. In investigating the complaint, it was determined that Mr. Halstead's out rings were within midnight shift hours when he was paid the shift premium.

4. Under prevailing company practice Building Chairmen were extended the privilege of being required to make only one ring.

5. In order to assure that the Building Chairman actually worked the shift in which his ring appeared, effective September 6, 1977, Mr. Halstead was informed that he would be paid a shift premium only when his starting time justified receipt of the premium.

6. Local management has continued to police Halstead and successor Building Chairmen and Alternates since September, 1977.

7. The plant has no intention of resuming the practice of paying Building Chairmen or Alternate Building Chairmen according to their out rings.

(App. at 165–66). Based on this affidavit, Ford argued that the shift premium issue had been resolved, and thus Count II was moot. The district court, however, never ruled on Ford's motion. Instead, at a status conference held on June 30, 1980, the parties indicated that settlement was possible on several counts of the complaint (including Count II), and the district court encouraged these settlement discussions, indicating that attorneys' fees would remain "on the table" should settlement be reached.

Finally, on February 17, 1981, Ford's counsel forwarded to Toth's attorney an unexecuted affidavit by A.W. Hanlon, a high-level Ford manager, which stated:

1. I am an employee of Ford Motor Company holding the position of Union Relations and Special Programs Manager, Diversified Products Operations.

2. In 1977 and 1978 I held the position of Manager, Union Relations Department, Labor Relations Staff, and was responsible for the administration of the collective bargaining agreement for Ford U.S.

3. My duties at that time included responsibility for investigation of complaints related to union affairs and the collective bargaining agreement.

4. In the latter part of 1977 a complaint by Frank Toth that the Building Chairman at the Monroe Plant was receiving an illegal 10% shift premium was brought to my attention through the office of Sidney F. McKenna, Vice President, Labor Relations Staff.

5. Mr. Toth's complaint was investigated, and it was determined that the Building Chairman had been informed that he would be paid a shift premium

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

2. The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of Section 381 of Title 28 (relating to notice to opposite party) to restrain violations of this section without regard to the provisions of section 17 of Title 15 and section 52 of this title, and the provisions of chapter 6 of this title.

29 U.S.C. § 186(e) (1982).

only if his in-rings supported payment of the premium.

6. I am not aware of the existence of the practice of paying building chairman [sic.] shift premiums based solely on their out-rings at any other Ford facility.

(App. at 369–70). Toth's attorney responded, on February 23, 1981, by acknowledging receipt of the affidavit and informing Ford's counsel that it had been forwarded to Toth with the recommendation that he accept it in settlement of Count II of the Second Amended Complaint. Eventually, Mr. Hanlon executed the affidavit and, according to the district court, it was attached as an exhibit to Toth's motion for attorneys' fees.

In granting attorneys' fees against the UAW International and Local 723, the district judge held that "[t]he promise by Ford's attorney to pursue the matter 'up the corporate ladder' in the process of securing an affidavit satisfactory to Toth was very much the kind of relief sought by Count II," and that Toth had "thereby conferred a benefit upon UAW members in Local 723 and nationally by memorializing in an affidavit from a responsible, national Ford official that the practice of paying union officers a shift premium based on only a single 'ring' was 'illegal' and would no longer be permitted." Nos. 79–71046/71047/71902, slip op. at 10, 11 (E.D. Mich. Aug. 2, 1982) (App. at 420, 421). The court, applying the "common benefit" exception to the American Rule against awarding attorneys' fees, ruled that an award of attorneys' fees against the unions was appropriate, even though they were not the losing defendants, since the court had jurisdiction over them.

**B.**

In 1973, a vote of the Local 723 membership authorized the Local's president to serve full time, but they declined, in 1975, to adopt an amendment to their bylaws which would have required a full-time president. Those bylaws did, however, contain the following provisions:

> [The] President and Building Chairman shall take time off for Union business whenever they deem it necessary for the betterment of the Union, but shall furnish proof of lost time and expense to be accepted by the trustees.

(Art. VII, § 1(C); App. at 62).

> The Local Union shall pay a representative or member lost time only when that representative or member is performing necessary duties for and on behalf of the Local Union during a time for which he would otherwise be compensated by the employer.

(Art. XI, § 6; App. at 66).

Frank Nadeau was elected president of Local 723 in June 1975, serving until 1978. Until October 15, 1977, when the membership defeated a proposal that he remain full time, Nadeau received full-time compensation from the Local. When Mr. Toth discovered this fact, he filed internal union disciplinary charges against Nadeau, alleging misappropriation of union funds, in March 1978. However, as in the other charges discussed above, Toth's charges were rejected by the Local and International leadership as an inappropriate means of resolving the issue. He made no formal demand for legal action to recover the money.

In Count III of the Second Amended Complaint, Toth alleged that Nadeau and the other members of the Local's Executive Board for the year 1977 had breached their fiduciary duties to the union under 29 U.S.C. § 501(a),[3] and he sought leave of

---

**3.** The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring

court to file a complaint against those union officials under section 501(b) of that title.[4] The district court never expressly ruled on Toth's request for leave.

Although the defendants named in Count III (except for Nadeau, who was never properly served) moved to dismiss the count, the district court deferred ruling on that motion, as in the case of Count II, because counsel indicated that settlement was under discussion. Ultimately, after a series of proposals and counter-proposals passed between the parties, counsel for the union sent to Toth's attorney an unexecuted stipulation of dismissal (of Count III) and the following proposed settlement agreement:

1. Plaintiff agrees, in consideration of the following, to dismiss without prejudice Count III of Plaintiff's Second Amended Complaint filed pursuant to Section 501(b) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 501.

2. The International Union, UAW agrees to initiate an investigation pursuant to Article 48 of the UAW Constitution into allegations that former President Frank Nadeau during the term of his office improperly received funds from UAW Local 723, and to take such other action as the International deems appropriate pursuant to its authority under the UAW Constitution.

3. The International Union will use its best efforts to complete its investigation within six months of the date hereof.

4. Upon completion of the investigation herein referenced, the International Union will make its written report available for inspection by members of Local 723.

5. The parties agree that the attached notice shall be posted at UAW Local 723. The parties further agree that this agreement shall not otherwise be posted, published, or distributed in any manner by any of the parties hereto.

6. This agreement constitutes the full and complete settlement of all claims, allegations, or other causes of action which relate in any manner to the allegations set forth in Count III of Plaintiff's Second Amended Complaint, concerning payments of money to Frank Nadeau by Local 723.

(App. at 391–92). It was not until September 18, 1981, three weeks after the district court dismissed the first four counts of Toth's fourth amended complaint, and six months after the above-quoted agreement was submitted to him, that Toth's attorney returned the agreement and stipulation, bearing his and Toth's signatures, to the union attorney. By that time, the defendants opposed entry of the stipulation of dismissal—which they had not yet signed—because of Toth's delay, his omission of the

---

any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

29 U.S.C. § 501(a) (1982).

**4.** When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation.

29 U.S.C. § 501(b) (1982).

Count III claim in the fourth amended complaint, and the dismissal of all but one of the counts of that latest complaint. Toth never sought entry of the dismissal, or enforcement of the settlement agreement, but (as stated above) requested attorneys' fees based on that settlement.

Finding that the union was estopped from denying the existence of the "settlement" of Count III because Toth had relied on the negotiations in omitting the allegations of Count III from the fourth amended complaint, the district judge concluded that "the settlement agreement made possible full relief of the type available under § 501(b) including an accounting to Local 723 members and reimbursement of any improper disbursements to the local's treasury." Slip op. at 12–13 (App. at 422–23). Therefore, under both the common benefit theory and the explicit language of 29 U.S.C. § 501(b), Toth was, according to the court, entitled to attorneys' fees from Local 723 as "the specifically benefitted labor organization." *Id.* at 14 (App. at 424).

## II.

### Attorneys' Fees under Count II

#### A.

In reviewing the award of attorneys' fees based on a settlement of Toth's Taft-Hartley Act claim, this Court is initially confronted with an unprecedented exercise of judicial authority against a third party. Although Count II of the Second Amended Complaint stated a claim (and sought injunctive relief) only against Ford, the entity which had made the alleged illegal payments to Messrs. Halstead and Cramer, the district court ordered the unions, parties neither to this claim nor to the purported settlement thereof, to pay the costs of Toth's legal counsel in asserting the claim and arriving at the settlement.

■ At the outset, we observe that "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian College v. Americans United For Separation of Church*

*and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). *See also Secretary of State of Maryland v. Joseph H. Munson Co.,* — U.S. ——, ——, 104 S.Ct. 2839, 2845, 81 L.Ed.2d 786 (1984). That judicial power "is the power of a court to decide and pronounce a judgment and carry it into effect *between persons and parties who bring a case before it for decision." Muskrat v. United States,* 219 U.S. 346, 356, 31 S.Ct. 250, 253, 55 L.Ed. 246 (1911) (emphasis added). Therefore, "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury *as a result of the putatively illegal conduct of the defendant,'* and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758 (citations omitted) (emphasis added). The court may not act to redress injury "that results from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976).

■ These limits to federal court jurisdiction have been commonly applied to deny a plaintiff standing to sue a particular party. *E.g., Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975) (no standing to challenge exclusionary zoning where petitioners "rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise"). But a necessary corollary to the standing rule can be found in a requirement that a plaintiff may only obtain recovery from a *party* to the lawsuit in question, i.e., a person or entity whose actions may be causally linked to the alleged injury, and from whom relief or remedy is possible. Although such a "case or controversy" may have existed, at some point, between Toth and Ford, the named defendant in Count II, neither the UAW International nor Local 723 was responsible for the payment of the 10% midnight shift

premiums to the two men, and no injunctive or other relief from those payments was, or could have been, sought from the union organizations.

■ Section 302(a) of the Taft-Hartley Act makes it "unlawful for any *employer* ... to pay ... any money ... to any employee ... of such employer ... or to any officer or employee of a labor organization," and subsection (e) of that section grants district court jurisdiction "to restrain violations," but there is nothing in section 302 which proscribes a labor union from *allowing* its officers or employees to accept such payments, or authorizes injunctive or other relief against a union which does so. Clearly, no justiciable dispute existed between Toth and the UAW with regard to the shift premiums paid to Halstead and Cramer, as evidenced by the union's nonparticipation in the settlement negotiations concerning those payments. We find no case law authority which supports or recognizes a separate cause of action for attorneys' fees against a person or entity merely "benefited" by the resolution of another lawsuit in the plaintiff's favor. And the liberal joinder of claims permitted by the Federal Rules of Civil Procedure—enabling Toth to assert his claim against Ford in the same action with his largely unrelated claims against the UAW and its officials—cannot create a "case or controversy" where none existed before.

Regardless of whether or not the court had *personal* jurisdiction over the union by virtue of the service of process on Toth's other claims, any judgment of recovery (including an attorneys' fees award) had to be grounded in *subject-matter* jurisdiction over an Article III case or controversy between Toth and the source of that recovery. *See generally Simon v. Eastern Kentucky Welfare Rights Organization,* *supra.* Here, the district court lacked the necessary jurisdiction to award attorneys' fees against the UAW International and Local 723.

**B.**

■ Moreover, the fee award against the union on Count II has no support in the case law under which attorneys' fees have been permitted in this country. According to the "American Rule," a prevailing litigant in the United States may only recover reasonable attorneys' fees from the loser, absent legislative authorization or contractual agreement, in the following instances: (1) when a party preserving or recovering a fund or property for the benefit of himself and others seeks attorneys' fees from the fund or property itself or from the other *parties* enjoying the benefit of the lawsuit; (2) when a party who has wilfully disobeyed a court is assessed attorneys' fees as a part of a fine; and (3) when the loser has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 247–59, 95 S.Ct. 1612, 1616–22, 44 L.Ed.2d 141 (1975). It was the first of these exceptions on which the district judge relied in assessing attorneys' fees in this case.

Unfortunately, however, the district court failed to recognize that awards of attorneys' fees from a common fund or based on a common benefit have been predicated on jurisdiction over the fund *as* the subject matter of the suit, or over the beneficiaries (either directly or through a representative organization) *as* a defendant party to the suit. *See, e.g., Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) (defendant union assessed fees on behalf of its membership who benefited from plaintiff's vindication of union-member rights under Landrum-Griffin Act); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (defendant corporation assessed fees as beneficiary of stockholder derivative suit to set aside corporate merger accomplished through misleading proxy statement); *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) (plaintiff recovered fees from earmarked funds in insolvent bank on which he established a lien for himself and, through *stare decisis,* for other depositors). As stated by Justice

Brennan in *Hall,* the common benefit exception to the "American Rule" permits recovery of attorneys' fees in "cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, *and where the court's jurisdiction over the subject matter of the suit* makes possible an award that will operate to spread the costs proportionately among them.'" 412 U.S. at 5, 93 S.Ct. at 1946 (quoting *Mills v. Electric Auto-Lite Co.,* 396 U.S. at 393–94, 90 S.Ct. at 1626–27 (emphasis added).

In holding that the court need only "have 'jurisdiction over an entity through which the contribution can be effected,'" slip op. at 11 (App. at 421) (quoting *Alyeska Pipeline,* 421 U.S. at 276, 95 S.Ct. at 1631 (Marshall, J., dissenting)), the district judge has confused jurisdiction over the person with jurisdiction over the subject matter, and thus torn Justice Marshall's statement from its "moorings" in the *Mills* decision cited in his opinion and quoted above. Liability for attorneys' fees cannot rest, without more, on the fortuitous chance that the claim on which a plaintiff seeks recovery of fees may be joined in the same action with a separate claim against the intended source of that recovery. The court making the award must have jurisdiction over the target of that award *by virtue* of its jurisdiction over the *subject matter* of the claim on which the award is based. Anything else violates the "case or controversy" requirement for federal court jurisdiction, and expands the "common benefit" theory far beyond its recognized bounds.

**C.**

 In view of the foregoing discussion, it is unnecessary, and indeed improper, for this Court to address the union's contention that the award of attorneys' fees on Count II was inappropriate on its merits because Toth should not be characterized as a "prevailing party." Although Ford also challenges that ruling, we need only hold that the district court correctly found that Ford could *not* be a target of an attorneys' fees

award as a representative for some general public interest which purportedly benefitted from the settlement of this claim. *See Alyeska Pipeline,* 421 U.S. at 265 n. 39, 95 S.Ct. at 1626 n. 39. We therefore turn now to the fee award against Local 723 based on the alleged settlement of Toth's claim under § 501 of the Landrum-Griffin Act.

**III.**

**Attorneys' Fees under Count III**

**A.**

Reviewing this portion of the district court's decision, we are first struck with the blatant *inequity* of this exercise of equitable power by the lower court. Although the district judge held the union estopped from denying the existence of a settlement of Count III for the purpose of assessing attorneys' fees, he ignored the provision of that settlement most directly bearing on the fee issue:

> This agreement constitutes the *full and complete* settlement of *all* claims, allegations, or other causes of action which relate in any manner to the allegations set forth in Count III....

(App. at 392) (emphasis added).

 Manifestly, this Court cannot consider Local 723 bound by estoppel to recognize that a settlement agreement had been reached, but fail to hold Toth was estopped from denying the above-quoted clause of that agreement, without doing considerable violence to the principle of mutuality of estoppel. *See City of Houston v. Southwestern Bell Telephone Co.,* 259 U.S. 318, 324, 42 S.Ct. 486, 488, 66 L.Ed. 961 (1922); 29 Am.Jur.2d *Estoppel and Waiver* § 115 (1966 & Supp.1984). The fact that Toth and his attorney had subscribed to the agreement containing that provision, while none of the defendants had done so, mitigates at the very least in favor of holding both sides estopped from denying the settlement's existence. Therefore, we find that the parties, through this settlement agreement, made a final disposition of all claims, including any request for attorneys' fees, regardless of whether or not such

fees were specifically mentioned in that agreement. *See Jennings v. Metropolitan Government of Nashville,* 715 F.2d 1111, 1114 (6th Cir.1983). Accordingly, the fees award against the union local had been precluded and was erroneously made by the district court.

### B.

■ We further conclude that the lower court was clearly erroneous in holding that the other terms of the alleged settlement entitled Toth to recover his attorneys' fees from Local 723 as the "prevailing party" on Count III. In *Johnston v. Jago,* 691 F.2d 283, 286 (6th Cir.1982), this Court adopted the following two-step analysis for determining whether a plaintiff should be considered a "prevailing party" for the purpose of awarding attorneys' fees in civil rights cases under 42 U.S.C. § 1988:

> 1. "[A] plaintiff must demonstrate that his or her lawsuit was causally related to securing the relief obtained. This determination is factual."
>
> 2. " 'If it has been judicially determined that defendants' conduct, however beneficial it may be to plaintiffs' interests, is not required by law, then defendants must be held to have acted gratuitously and plaintiffs have not prevailed in a legal sense.' ... [T]his legal inquiry does not entail full trial on the merits. Rather, the trial court need only consider whether the plaintiff's claim is 'frivolous, unreasonable or groundless.' "

(Quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 281 (1st Cir.1978) ).

Applying this analysis to the facts of this case, it is highly likely that Toth did not prevail in any legal sense, and that his lawsuit had no significant causative effect on the unions' future actions. The settlement agreement only provided that the UAW International would undertake, in accordance with Article 48 of its Constitution, a financial investigation of the salary payments made to Frank Nadeau while he was president of Local 723. This result might well have been obtained, without the time and expense of a lawsuit, had Toth sought such an investigation instead of doggedly pursuing disciplinary charges against Nadeau and then filing a court action without at least attempting other intra-union remedies. While the record before us provides no basis for concluding that such other remedies would have met with success, it is equally devoid of evidence, or any finding by the district court, that they would have been an exercise in futility.

Since the unions conceded no impropriety in the making or receiving of those payments, nor in refusing to process Toth's disciplinary charges, but only agreed to investigate the matter and take whatever action it deemed appropriate, we believe the lawsuit *may* have been an unnecessary detour, rather than a direct path, to any determination of whether Mr. Nadeau was entitled to full-time compensation as local president. Unnecessary litigation is no basis for an award of attorneys' fees. *Mezo v. International Union, United Steelworkers,* 558 F.2d 1280, 1283 (7th Cir.1977). Although such an award can be proper in a demonstrably meritorious case, we should be mindful of the fears of Justices White and Rehnquist concerning the "awarding [of] attorneys' fees in member-union litigation, which so often involves private feuding having no general significance." *Hall v. Cole,* 412 U.S. at 16, 93 S.Ct. at 1951 (White, J., dissenting). Such feuding, together with a highly litigious and combative nature on the part of Mr. Toth, apparently brought about the present lawsuit. The district court erred in encouraging these kinds of cases by awarding Toth attorneys' fees with *some* examination of its necessity and merit.[5]

---

**5.** In light of our resolution of this issue, we have no occasion to address the union's further contention that Count III of Toth's Second Amended Complaint was not properly before the District Court because leave to file that claim was never expressly granted and the requisites for such leave (i.e., a rejected demand upon the union for legal action or an accounting, and a showing of good cause) were not present in this case. Assuming without deciding that Count III *was* properly before the court below, the fee

The judgment of the district court awarding attorneys' fees against the unions is therefore reversed and the case is remanded to the district court for proceedings not inconsistent with this opinion as to Toth's remaining state-law claim.

award was nevertheless inappropriate for the aforesaid reasons.