**Mark TAYLOR, et al. Plaintiffs,**

v.

**GREAT LAKES SEAMEN'S UNION, LOCAL 5000, United Steelworkers of America, et al. Defendants.**

**No. C80–1307.**

United States District Court, N.D. Ohio.

Oct. 29, 1984.

On Motion for Reconsideration Nov. 29, 1984.

On Motion for Attorney Fees Oct. 24, 1985.

Theodore E. Meckler, Meckler & Meckler, Cleveland, Ohio and Daniel E. Clifton, Hall, Clifton & Schwartz, New York City, for plaintiffs.

Mark A. Rock and Joyce Goldstein, Schwarzwald, Robiner, Wolf & Rock Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Plaintiffs move "for an order awarding them attorneys' fees."[1] As requested in the court's notice of hearing on October 24, 1984, counsel presented oral argument on the issue of whether this court has jurisdiction to pass on the plaintiffs' application for attorneys' fees. It is essential that the court rule on this threshold question before proceeding further with consideration of plaintiffs' application for attorneys' fees.

### I.

■ Jurisdiction to award attorneys' fees depends on this court's underlying jurisdiction to hear and determine plaintiffs' complaint of July 25, 1980. *Toth v. United Automobile, Aerospace and Agricultural Implement Workers of America,* 743 F.2d 398 (6th Cir.1984). Plaintiffs Taylor, Penocvich and Hale alleged violations of section 101(a)(1) of the Labor Management Reporting and Disclosure Act of 1959

---

1. In *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Supreme Court referred interchangeably to "counsel fees" and "attorneys' fees." Plaintiffs use the latter term in their application, and this court will adopt that convention. However, it is noted that in 42 U.S.C. § 1988 (not directly applicable here), it is provided that in cases brought under the identified civil rights statutes, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable *attorney's fee* as part of the cost." (Emphasis added.)

(LMRDA), 29 U.S.C. § 411(a)(1), and jurisdiction under section 102 of the LMRDA, 29 U.S.C. § 412. The complaint included six claims, but only the first two are relevant to the present issue. The plaintiffs sought to enjoin defendants Great Lakes Seamen's Union, Local 5000, United Steelworkers of America and Danny Lee Lupu, president of Local 5000, from holding elections for officers of defendant Great Lakes Seamen's Union 5000, until certain remedies were effected. Two of the requested remedies were that defendants send notices of nominations and elections to the home address of every member and afford all members in good standing an equal opportunity to vote in the election of officers of Local 5000.

In the class action allegations of their complaint, plaintiffs asserted that the class numbered approximately 800 out of a total membership of 1,800. Members of the class represented by the named plaintiffs were members in good standing of Great Lakes Seamen's Union, Local 5000, United Steelworkers of America, but were not working at that time or at any time from May through August 1980.

In their first claim for relief, plaintiffs stated that in May, June and July 1980, approximately 1,000 members of Local 5000 were employed and that in May 1980, "written notice of nominations and elections for officers of Local 5000 was sent to every vessel on which Local 5000 members were employed." These nominations were "to be made on board any vessel during the period between May 22, 1980 and June 9, 1980." Plaintiffs further alleged that because they were not on board a vessel in May or June 1980, they were not informed that nominations would take place. They stated that

> [n]either Penocvich, Hale, nor any other member of Local 5000 who was not serving on board a vessel in May or June 1980, was given the opportunity to nominate anyone to be a candidate for any office in the Local 5000 elections.

Plaintiffs then alleged that Penocvich, Hale and the class which they represent "have been discriminated against in their right to nominate candidates by virtue of defendants' actions and omissions, a right which was afforded to union members who were employed during May and June, 1980." Thus, they claimed that the class they represent were deprived by defendants of their equal rights within Local 5000 to nominate candidates for office in violation of section 101(a)(1) of LMRDA, 29 U.S.C. § 411(a)(1).

In their second claim for relief, plaintiffs alleged that "pursuant to voting instructions sent to the vessels ... the ballots are to be returned to the Local 5000 office in Cleveland, Ohio, not later than August 11, 1980" and that "all voting is to take place on board the said vessels." Plaintiffs stated that "[n]o notice of the election and no ballots had been sent to the home addresses of Penocvich, Hale or Taylor or any of the approximately 800 members of Local 5000 who are not serving on board a vessel during July and August, 1980."

Plaintiffs further alleged that no provision for balloting was made to accommodate members of Local 5000 "who are not serving on board a vessel." They stated that Taylor and other members of Local 5000 had sent communications to Local 5000, "requesting the right to vote in the election of officers" but they had only received an acknowledgement of said communications.

Plaintiffs Taylor, Penocvich and Hale and the class which they represent then alleged that they "have been discriminated against in their right to vote as the result of defendants' actions and omissions, which right has been afforded the union members who were employed during July and August, 1980." They stated that these actions and omissions have deprived plaintiffs "of their rights within the Union to vote in elections of said labor organizations in violation of section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1)."

On July 25, 1980, plaintiffs also filed with this court a motion for temporary restraining order and a motion for preliminary injunction. Among other things, plaintiffs asserted that "the election for local union office was scheduled to be held

from some time in July, 1980 until no later than August 11, 1980." They asked that the defendants be enjoined from "[h]olding elections for officers of Local 5000, until notices of nominations and election are sent to the home address of every member; and all members in good standing are afforded an equal opportunity to nominate candidates to run for office; and all members in good standing are afforded an equal opportunity to vote in the election of officers of Local 5000."

In support of the motions, plaintiffs attached a copy of a letter from plaintiff Mark Taylor to president Lupu of Local 5000, in which he stated:

Some arrangement should be made for those sailors who, although unemployed, are otherwise eligible to vote. Perhaps a mailed ballot could be sent to our homes. Please let me know what you come up with soon as the elections are only a few weeks away.

By letter of July 16, 1980, president Lupu acknowledged receipt of Mark Taylor's certified letter and added, "[I] note your comments." [2]

In a telephone conference hearing on July 25, 1980 between the court, attorney Theodore E. Meckler for the plaintiffs, and attorney Melvin S. Schwarzwald for the defendants, the court denied the motion for a temporary restraining order and set the case for a preliminary injunction hearing on August 7, 1980 at 9:30 a.m.

At the outset of the court hearing of August 7, 1980, Mark Rock, counsel for the defendants, stated in open court:

The determination has been made that the election which has been conducted in the case among the membership of Local 5000 is being stopped.

He continued:

The ballots are not going to be counted, and the entire election will be rerun beginning at the earliest point; that is, with the nomination procedure, so it will be run completely over again, and I believe,

based on that fact, that any proceeding that we might have here today would be unnecessary, and this is essentially— since this is essentially the relief which plaintiff is looking for, and we have decided voluntarily to do this, and therefore that would moot the plaintiffs' claim at this point.

In further colloquy, Mr. Rock stated:

The International people should be available next week, and we should have a better idea in probably two weeks precisely where we are going to be able to go and what our time table looks like.

In response, Mr. Meckler said that there were "substantial questions here concerning our clients' Landrum-Griffin rights with respect to nomination and election." He stated that

We would certainly like some kind of provision built in today whereby defendants have to make some sort of report to the court at a date certain as to what precisely they are going to do and when they are going to do it, so if there are problems, we can deal with them.

He also took issue with Mr. Rock, stating that the defendants "decided to do this on a voluntary basis." He added:

I think the compulsion of this lawsuit and the fact that a preliminary injunction hearing was set for this morning, and a decision really didn't come down to so-called "voluntarily" make this gesture until the eleventh hour, as it were, late yesterday afternoon; and to characterize this kind of decision as voluntary I think sort of strays from the reality of the situation.

Thereafter, the court noted that Mr. Rock had indicated that "the present election is being brought to a screeching halt, and a new procedure is going to be undertaken." Arrangements were made for defendants to submit reports, the first on August 28. The court retained the option "to set another hearing."

---

**2.** Other documents were attached to the motions which relate to Mr. Taylor's nomination as a candidate for president of the local union and as "fleet representative." Since these documents relate to claims 5 and 6 of the complaint and are not involved in the present application of plaintiffs for attorneys' fees, they will not be described.

On December 18, 1980, the International Executive Board of the United Steelworkers of America adopted by-law amendments for Local 5000. The eligibility requirements to run for a local union office were relaxed. Procedures for nominations and elections were revised. As the international union put it, "a new system ... will call for the use of the mail ballot for both nominations and the election." [3]

## II.

In charging that defendants denied them and the class they represented their equal rights to nominate candidates for local union offices and to vote in the ongoing union election, plaintiffs have alleged that each denial violated rights secured by section 101(a)(1) of Title I of LMRDA, 29 U.S.C. § 411(a)(1). In pertinent part, this section provides:

> Equal rights—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization ... subject to reasonable rules and regulations in such organization's constitution and by-laws.

Plaintiffs contend that they may seek injunctive relief under section 102 of Title I, 29 U.S.C. § 412, which authorizes the bringing of a civil action by any person "whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter," and which expressly includes injunctions as appropriate relief.

Challenging this court's jurisdiction under Title I of LMRDA, defendants insist that plaintiffs' first and second claims rest entirely on section 401(e) of Title IV and that enforcement of rights under this section of Title IV is lodged exclusively in the Secretary of Labor under sections 402 and 403 of Title IV, 29 U.S.C. §§ 482 and 483. In pertinent part, section 401(e) provides:

> In any election required by this section which is to be held by secret ballot, a reasonable opportunity shall be given for the nomination of candidates and every member in good standing ... should have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline or improper interference or reprisal of any kind by such organization or any member thereof.

The section continues:

> Not less than 15 days prior to the election notice thereof shall be mailed to each member at his last known address. Each member in good standing shall be entitled to one vote.... The election shall be conducted in accordance with the constitution and by-laws of such organization insofar as they are not inconsistent with the provisions of this subchapter.

As the above-quoted language reveals, both section 101(a)(1) of Title I and section 401(e) of Title IV serve to protect the nomination and election rights of members of labor organizations. However, in keeping with the purpose of section 101, which is designated the "Bill of Rights" for members of labor organizations, references to nominations and elections are phrased in more general terms in section 101(a)(1) than in section 401(e). In guaranteeing to "every member ... equal rights and privileges within such labor organization to nominate candidates" and "to vote in elections or referendums of the labor organization," section 101(a)(1) protects each member and class of members from discrimination in the exercise of members' basic franchise rights within the labor organization. Thus, this section proscribes unreasonable differences in treatment among individual

---

**3.** In April 1981, plaintiffs filed an amended complaint challenging the local union's application of the Local's membership by-law. Local membership was by "virtue of membership in the International Union." After a hearing, this court held that the plaintiffs failed to show that the local union's definition of membership, as applied, was unreasonable. The court denied plaintiffs' request for a preliminary injunction against continuation of the ongoing election (under the new election procedures). The denial was upheld on appeal. However, this later challenge is not presently relevant since plaintiffs only seek attorneys' fees for their work on the initial challenge in 1980.

or classes of members. In different and more detailed terms, section 401(e) of Title IV spells out franchise rights of individual members. For example, the "right to vote for or otherwise support the candidate ... of his choice" emphasizes that this right is not to be subjected to "penalty, discipline, or improper interference or reprisal of any kind by such organization or member thereof."

This court's interpretation of section 101(a)(1) conforms to the Supreme Court's construction of this section in *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964):

> Plainly, this is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote. And Congress carefully prescribed that even this right against discrimination is "subject to reasonable rules and regulations" by the union.

The Court then distinguished the facts in *Calhoon,* noting that "[w]hether the eligibility requirement set by the union's constitution and by-laws were reasonable and valid is a question separate and distinct from whether the right to nominate on an equal basis given by section 101(a)(1) was violated." However, section 101(a)(1)'s "right to nominate and vote on an *equal* basis," which *Calhoon* recognized as a protection against individual or class discrimination, is not found in section 401(e).

■ The Court in *Calhoon* referred to "members and classes of members [who] shall not be discriminated against in their right to nominate and vote" without qualifying the type or nature of "classes of members." It is reasonable, therefore, to treat the entire membership of Local 5000 as a class composed of two subclasses, employed members and unemployed members. While members of Local 5000 from time to time may move from one subclass to the other subclass, at any given time the composition of each subclass is distinct and ascertainable. Hence, it is concluded that the plaintiffs defined an appropriate subclass, namely the 800 members of Local 5000 (including plaintiffs Penocvich and

Hale), who were not working on shipboard and therefore did not receive notices of nominations and elections or ballots for the ongoing election.

It is further concluded that this subclass of 800 unemployed members was treated differently than the subclass of employed members who by their presence on shipboard were able to exercise their rights to nominate and vote. Plaintiffs' claims of disparity of treatment between the subclasses of membership alleged a substantial violation of the "equal rights" guarantee of section 101(a)(1). Thus, these two substantial claims of section 101(a)(1) violations established this court's jurisdiction in this case under Title I.

Defendants argue that by asking that notices of nominations and elections and ballots be sent to the residences of members, the plaintiffs are requesting something required by section 401(e), thereby bringing their claims within the Secretary of Labor's exclusive jurisdiction under Title IV. As seen, there is an overlap between section 101(a)(1) of Title I, and section 401(e) of Title IV. But there is nothing in section 401(e) that states that its election procedure requirements supersedes section 101(a)(1). As they state, plaintiffs have alleged discriminatory denial of their rights to nominate and to vote in violation of section 101(a)(1). The essence of these claims is not altered merely because the relief they sought was in part similar to an election procedure requirement of section 401(e) of Title IV.

The conclusion that this court has jurisdiction is not altered by cases which have held that suit by the Secretary of Labor is the exclusive remedy for Title IV post-election claims. In pertinent part, section 403 of Title IV, 29 U.S.C. § 483 states:

> Existing rights and remedies to enforce the constitution and by-laws of a labor organization with respect to elections prior to the conduct thereof shall not be effected by the provisions of this subchapter. The remedy provided by this subchapter for challenging an election already conducted shall be exclusive.

In *Trbovich v. Mine Workers,* 404 U.S. 528, 531, 92 S.Ct. 630, 632, 30 L.Ed.2d 686 (1972), the Court observed that section 403 makes "suit by the Secretary [of Labor] the 'exclusive' post-election remedy for a violation of Title IV." [4] Similarly, in *McGuire v. Grand International Division of Brotherhood of Locomotive Engineers,* 426 F.2d 504, 508 (6th Cir.1970), the court found that the "gravamen" of the complaint "plainly falls within Title IV" and "[w]here post election relief is sought under Title IV exclusive remedy is provided by that Title. Only the Secretary may bring suit.... *Calhoon v. Harvey, supra,* 379 U.S. 134 [85 S.Ct. 292]."

In the present case, the election was ongoing at the time plaintiffs filed their action on July 25, 1980. The voting period was to continue through August 11, 1980. Before the expiration of that period, Local 5000, after consultation with the international union, "brought the election to a screeching halt." Since plaintiffs were not seeking post-election relief under Title IV, *Trbovich* and *McGuire* do not apply, and the remedy provided by Title IV is not exclusive. Instead, section 101(a)(1) of Title I does apply and controls the relief sought under the first and second claims of plaintiffs' complaint, and this court has jurisdiction over plaintiffs' Title I claims.

### III.

This court's finding of jurisdiction is in accord with other court decisions since *Calhoon* which have found jurisdiction in pre-election suits where the plaintiff alleged a substantial claim under section 101 of the LMRDA. *See Bunz v. Moving Picture Machine Operators' Protective Union Local 224,* 567 F.2d 1117, 1120–22 (D.C. Cir. 1977); *Amalgamated Clothing Workers of America Rank and File Committee v. Amalgamated Clothing Workers of America, Philadelphia Joint Board,* 473 F.2d 1303, 1306 (3d Cir.1973); *Depew v. Edmiston,* 386 F.2d 710, 714 (3d Cir.1967).

The court's discussion of the jurisdictional issue in *Bunz,* 567 F.2d at 1120–22, is instructive. In that case, the issue presented was whether the court had jurisdiction over a union member's claim that he was denied an "equal right to vote" under section 101(a)(1) when "his union conducted a referendum in plain disregard of its bylaws." *Id.* at 1119.

The court in *Bunz* first noted that section 102 of the LMDRA, 29 U.S.C. § 412, gives federal courts jurisdiction in civil actions brought by persons whose rights have been infringed by any violation of "this subchapter," which is "Subchapter II—Bill of Rights of Members of Labor Organizations." The *Bunz* court then stated that courts have "consistently held" that "federal courts 'do not possess jurisdiction to enforce union constitutions and bylaws where there has been no violation of a specific right enunciated in [section 101(a) of the Act].'" *Id.* at 1120, *quoting McGovern v. New Orleans Clerks Local 1497,* 343 F.Supp. 351, 352 (E.D.La.), *aff'd per curiam,* 463 F.2d 423 (5th Cir.1972). After finding that plaintiff did not have a claim under section 101(a)(3), the court determined that for plaintiff to prevail, "he must be able to predicate jurisdiction on a violation of a specific right enunciated in § 101(a)(1)." *Id.* at 1120.

In considering whether the plaintiff's rights under section 101(a)(1) had been violated, the *Bunz* court first discussed what the phrase "equal right to vote" means. The court stated:

> The Supreme Court has described § 101(a)(1) as 'a command that members and classes of members *shall not be discriminated against* in their right to nominate and vote.' A union's discrimination against its members is most obvious, of course, when it denies some of them the right to vote outright.

*Bunz,* 567 F.2d at 1121 (footnotes omitted). The *Bunz* court then went on to find that discrimination may be found even if all

---

**4.** The Court added that the Court has held that "section 403 prohibits union members from initiating a private suit to set aside an election." *Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964). It is evident that the Court is referring to an election that has already been conducted and completed.

members had a right to cast a ballot, because "the right each member has to vote must be 'meaningful.'" *Id.* One of the many cases cited by the *Bunz* court in support was *Blanchard v. Johnson*, 388 F.Supp. 208, 213–14, 216 (N.D.Ohio 1975), where the court found that the "equal right to vote" was denied where union officials withheld certain information relevant to the issue the members were voting on. The court in *Blanchard* did not explicitly discuss the jurisdictional issue, but nevertheless ruled on the merits of plaintiffs' claim.

The instant case does not even fall into the less obvious case of discrimination over which the courts in *Bunz* and *Blanchard* asserted jurisdiction. Rather, in the instant case the union's discrimination was obvious because it "denie[d] some [members] the right to vote outright" by not mailing notices and ballots to any member in the subclass of unemployed members who were not on board ship at that time. Thus, plaintiffs' complaint alleged a violation of a "specific right enunciated in § 101(a)(1)," the "equal right to vote."

The court's jurisdictional analysis in *Bunz* is consistent with *Depew v. Edmiston*, 386 F.2d 710 (3d Cir.1967). In *Depew*, plaintiffs claimed that the union had violated section 101(a)(1) by discriminating against one of the plaintiffs, who had been nominated for union office but who was declared ineligible based on a particular membership rule. The district court had dismissed the complaint for lack of subject matter jurisdiction based on *Calhoon*, and had "characterized the appellants' contention as one concerning solely eligibility restrictions of candidates for union office." *Id.* at 712.

The appellate court in *Depew* disagreed with the district court's conclusion, stating:

*Calhoon v. Harvey*, supra, makes clear, however, that the crucial question for the court is whether or not a union member has been discriminated against in one of the rights enumerated in § 101(a)(1). If such discrimination is present, a cause of action exists under § 101(a)(1) regardless of other claims; absent such discrimina-

tion, the courts have no such jurisdiction. This case is outside the mandate of Calhoon v. Harvey, since the factual context shows that discrimination in the nominating and voting rights of membership lies at the core of this controversy.

*Id.* The appellate court then noted that unlike *Calhoon*, there was not an attempt by plaintiffs to show that the application of an eligibility requirement led to a section 101(a)(1) violation, but rather the union had distinguished among "members," interfering with section 101(a)(1) rights to nominate and vote. *Id.* Thus, *Depew* held that the district court had jurisdiction over that claim.

As in *Depew*, plaintiffs in the instant case allege that the union distinguished among members, depending upon whether or not they were on board ship at the time the notices and ballots were sent, and that this alleged discrimination infringed specific rights granted under section 101(a)(1). Hence, this court has jurisdiction over these claims.

The above analysis is not inconsistent with the Sixth Circuit Court's decision in *McGuire*, 426 F.2d 504. In *McGuire*, the court discussed the potential overlap between Title I and Title IV. Before concluding that the gravamen of plaintiff's complaint fell within Title IV, the *McGuire* court noted that "McGuire has not alleged discrimination which would give rise to an independent claim under Title I." *Id.* at 508, *citing Depew*, 386 F.2d 710, and *Mamula v. United Steelworkers of America*, 304 F.2d 108 (3d Cir.), *cert. denied*, 371 U.S. 823, 83 S.Ct. 42, 9 L.Ed.2d 63 (1962). In contrast, plaintiffs in the instant case have alleged discrimination giving rise to an independent claim under Title I.

## IV.

Upon the grounds and for the reasons set forth above, it is determined that this court has jurisdiction to hear and determine the first and second claims of plaintiffs' complaint. Accordingly, the court has jurisdiction to pass on the plaintiffs' application for attorneys' fees.

IT IS SO ORDERED.

ON MOTION FOR RECONSIDERATION

In a memorandum and order of October 29, 1984, this court determined that it had jurisdiction under Title I of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) over the first and second claims of plaintiffs' complaint, and therefore had jurisdiction over plaintiffs' application for attorneys' fees. Defendants now move for reconsideration in light of *Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley,* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984), which was not previously cited by either party nor considered by the court.

### I.

In *Crowley,* the Court addressed the issue of "whether suits alleging violations of Title I may properly be maintained in district court during the course of a union election." 104 S.Ct. at 2559. Since this suit alleged violations of Title I and was brought "during the course of a union election," *Crowley* is relevant and will be considered.

The dispute in *Crowley* arose during the course of an election for officers of a union's executive board. Nominations were made at a meeting held on November 9, 1980, and the regularly scheduled election was to take place the last two months of 1980. Two of the controversial aspects of the nominating meeting were described by the Court as follows:

First, admission to the meeting was restricted to those members who could produce a computerized receipt showing that their dues had been paid up to date. Several union members, including respondent Jerome Crowley, were prohibited from entering the meeting because they did not have such dues receipts in their possession. Second, during the actual nominations process, there was disagreement relating to the office for

which respondent John Lynch had been nominated.

*Id.* at 2560.

After a protest filed with the union by several union members was denied on November 20, election ballots were distributed and were due back by December 13, 1980 at 9:00 a.m.[1] On December 1, 1980, plaintiffs brought action in district court seeking a preliminary injunction. Plaintiffs alleged in part that the union had violated their equal rights to nominate candidates and attend membership meetings, guaranteed by section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1), as well as their right to freely express views, guaranteed by section 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2).

On December 12, 1980, the day before the ballots were due, the court granted a temporary restraining order which required that the ballots be sealed and delivered to the court. Subsequently, after "[s]everal days of hearings on the preliminary injunction, and several months of negotiations concerning an appropriate court order," the court issued a preliminary injunction on July 13, 1981. 104 S.Ct. at 2561. In its accompanying memorandum opinion, the district court issued a "comprehensive injunction" which did the following:

[T]he order declared the ballots cast in December 1980 to be "legally without effect," ... and provided detailed procedures to be followed by the union during a new nominations meeting and a subsequent election. Among other things, the order selected an outside group of arbitrators to conduct and supervise the election, and set forth eligibility requirements for attending the nominations meeting, being a candidate for office, and voting. The order also provided that it would remain in effect until further order of the District Court.

*Id.* at 2562 (footnotes and citations omitted).

The Supreme Court held that the district court had gone beyond the boundaries of an "appropriate" remedy for a Title I suit

---

**1.** As the Court noted, "Respondent Lynch's name appeared on the ballot as a candidate for president, and not for secretary-treasurer." 104 S.Ct. at 2560.

filed during a union election when it invalidated an ongoing election and then supervised a new election. *Id.* at 2568–69. After examining the statutory provisions and legislative history of Title I and Title IV of the LMRDA, the Court addressed the issue of "how the exclusivity of Title IV's remedial scheme for enforcing rights guaranteed by that title might affect remedies available to enforce other rights, such as those protected by Title I." *Id.* at 2566. More specifically, the Court examined "whether Title I remedies are available to aggrieved union members while a union election is being conducted." *Id.*

Finding the legislative history inconclusive, the Court turned to the "primary objectives" of the LMRDA for guidance on "the availability of Title I remedies during a union election." *Id.* at 2567. The Court concluded that "whether a Title I suit may properly be maintained during the course of a union election depends upon the nature of the relief sought by the Title I claimants." *Id.* After examining congressional intent further, the Court concluded that "Congress did not consider court supervision of union elections to be an 'appropriate' remedy for Title I suit filed during the course of a union election." *Id.* Later summarizing its conclusion, the Court stated:

> In sum, whether suits alleging violations of Title I of the LMRDA may properly be maintained during the course of a union election depends upon the appropriateness of the remedy required to eliminate the claimed statutory violation. If the remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV. For less intrusive remedies sought during an election, however, a district court retains authority to order appropriate relief under Title I.

*Id.* at 2571.

Prior to this summary, however, the Court had emphasized that certain suits may be brought under Title I during an election. A suit may be brought if the alleged Title I violations "are easily remedi-

able under that title without substantially delaying or invalidating an ongoing election." *Id.* at 2568. The Court explained further with the following example:

> [U]nion members might claim that they did not receive election ballots distributed by the union because of their opposition to the incumbent officers running for reelection. Assuming that such union members prove a statutory violation under Title I, a court might appropriately order the union to forward ballots to the claimants before completion of the election. To foreclose a court from ordering such Title I remedies during an election would not only be inefficient, but also would frustrate the purposes that Congress sought to serve by including Title I in the LMRDA.

*Id.* at 2569. Thus, the Court made clear that such an "easily remediable" Title I claim may be properly maintained during the course of an election.

Defendants argue that under this "easily remediable" test of *Crowley*, this court lacked jurisdiction to grant the relief requested by the plaintiffs, "or to otherwise remedy the alleged Title I violations." More specifically, defendants contend that

> Plaintiffs' first two causes of action challenge both the nomination and election procedures. The nominations were already completed and the election ballots mailed before the Plaintiffs brought their lawsuits. The requested injunctive relief, *during the course of an election*, would have required the Union to engage in new nominations and a new election. Nothing short of invalidation and a new election could remedy the violations alleged in the first two causes of action. As the Supreme Court found in *Crowley*, a District Court specifically lacks Title I jurisdiction to stop an ongoing election and order a new one.

Plaintiffs respond by first arguing that *Crowley* "was not concerned with subject matter jurisdiction at all" but rather only dealt with the issue of the appropriateness of the relief granted. Even assuming *Crowley* applies to the issue of jurisdiction, plaintiffs argue, this Title I suit was prop-

erly maintained in federal court under the standards enunciated in that case. Plaintiffs emphasize that in the instant case the court's involvement was minimal and that "any relief obtained by Plaintiffs was obtained due to the actions of the Union and *not* the Court."

While plaintiffs are correct in noting that the language of *Crowley* is framed largely in terms of the appropriateness of relief granted under Title I, plaintiffs ignore that *Crowley* explicitly addresses what type of Title I suits "may properly be maintained during the course of a union election." 104 S.Ct. at 2571. Therefore, contrary to plaintiffs' argument, *Crowley* applies to the issue of subject matter jurisdiction over a Title I suit. Indeed, the Court's focus on the nature of the relief sought originated from an examination of the jurisdictional provision governing Title I suits, section 102 of the LMRDA, 29 U.S.C. § 412.[2] After quoting 29 U.S.C. § 412, the Court stated:

> Standing by itself, this *jurisdictional provision* suggests that individual union members may properly maintain a Title I suit whenever rights guaranteed by that title have been violated. At the same time, however, § 102 explicitly limits the relief that may be ordered by a district court to that which is "appropriate" to any given situation.

104 S.Ct. at 2564 (emphasis added). Thus, the Court emphasized the appropriateness of relief as an express limit on the court's Title I jurisdiction.

Other language in *Crowley* supports the argument that *Crowley* is relevant to the issue of Title I jurisdiction. For example, the Court concluded that "whether a Title I suit *may properly be maintained* by individual union members during the course of a union election *depends upon* the nature of the relief sought" by the Title I claimants. *Id.* at 2567 (emphasis added). Further, after later concluding that court supervision of union elections was not an "appropriate" remedy, the Court stated:

> That is *not* to say that a court has *no jurisdiction* over otherwise proper Title I claims that are filed during the course of a lengthy union election.

*Id.* at 2568 (emphasis added). The Court then discussed when union members may *"properly allege* violations of Title I." *Id.* The language underscored above shows that the Court in *Crowley* was addressing what Title I claims may be pursued in a federal district court during the course of a union election. Further, *Crowley* links a court's subject matter jurisdiction to hear a Title I claim under section 102 of LMRDA, 29 U.S.C. § 412, during the course of a union election to the appropriateness of the relief sought.

While the court concludes that *Crowley* applies to the present jurisdictional issue, the court also finds that contrary to the assertion of the defendants, *Crowley* should not be read to preclude this court's jurisdiction in the instant case.[3] As seen, the Court made clear that certain Title I suits may be properly maintained during a union election. Further, the Court provided a specific example of when an alleged Title I violation would be "easily remediable ... without substantially delaying or invalidating an ongoing election." 104 S.Ct. at 2568–69. If Title I was shown to be violated as a result of union members not receiving ballots "distributed by the union because of their opposition to incumbent officers running for reelection," then the court could "appropriately order the union to forward ballots to the claimants before completion of the election." *Id.* at 2569. The Court observed that "[t]o foreclose a court from ordering such Title I remedies during an election would not only be inefficient but would also frustrate the

---

**2.** This section provides in relevant part:

> Any person whose rights secured by the provisions of this [title] have been infringed by any violation of this [title] may bring a civil action in a district court of the United States *for such relief* (including injunctions) *as may be appropriate.*

29 U.S.C. § 412 (emphasis added).

**3.** Since the court herein concludes that it would have had jurisdiction over at least part of plaintiffs' claims even under *Crowley*, the court need not reach the issue of whether *Crowley* should be retroactively applied in determining the present jurisdictional issue.

purposes that Congress sought to serve by including Title I in the LMRDA." *Id.*

In the instant case, only plaintiffs' first two claims and the two related requests for relief are relevant to the present issue. Their first claim alleged that plaintiffs were deprived of their equal rights "to *nominate* candidates for office," and their second claim alleged that they were deprived of their rights "to *vote* in elections" of defendant union. (Emphasis added.) The first paragraph of plaintiffs' request for relief is directed to their first claim regarding nominating rights as follows:

1. For an injunction against defendants, enjoining and restraining the holding of elections for officers of Local 5000 until:

(a) Local 5000 *sends notice of nominations and elections* to the home address of every member; and

(b) Local 5000 affords all members in good standing an *equal opportunity to nominate* candidates to run in said election;

(Emphasis added.) The second paragraph of their request for relief is directed to their second claim regarding voting rights, as follows:

2. For an injunction against defendants, directing defendants to afford all members in good standing an *equal opportunity to vote* in the election of officers of Local 5000....

(Emphasis added.)

These two paragraphs show that the relief plaintiffs sought was in two parts, corresponding to their two separate claims. Only the first paragraph, which relates to the right to nominate, requests "enjoining and restraining the holding of elections." In contrast, the second paragraph, relating to the right to vote, only requests "an injunction ... directing defendants to afford all members in good standing an equal opportunity to vote."

Defendants argue that "[n]othing short of invalidation and a new election could remedy the violations alleged in the first two causes of action." The court does not agree. It is true that under the jurisdictional test outlined in *Crowley*, this court probably would not have had jurisdiction to grant the relief requested in plaintiffs' first paragraph.[4] If the court had enjoined the continuation of the ongoing election and ordered the union to start over, this time sending notices of the nominations and elections to the home address of every member, that order would have in effect invalidated an ongoing election, which was found impermissible in *Crowley*.

Nevertheless, the court would have had authority, as in the example set forth in *Crowley*, to "order the union to forward ballots" to the home address of members who had not yet received one "before the completion of the election." 104 S.Ct. at 2569. Such an order, if issued at the preliminary injunction hearing of August 7, 1980,[5] might have necessitated some delay in counting all ballots, which were originally due on August 11, 1980. However, this would have been permissible under *Crowley* if it did not entail "substantial delay." The court therefore concludes that this suit properly alleged certain Title I violations which would have been "easily remediable ... without substantially delaying or invalidating the ongoing election."[6] *Id.* at 2568–69.

The court further concludes that since the court had subject matter jurisdiction over at least part of plaintiffs' claims, this subject matter jurisdiction is sufficient to allow this court to award any appropri-

---

**4.** The transcripts of the hearing of July 25 and August 7 give no indication that the court considered granting an injunction under plaintiffs' first claim.

**5.** At the August 7 hearing, as described in the October 29 ruling, the defendants immediately informed the court that the union was stopping and rerunning the election beginning with the nominations.

**6.** If plaintiffs were dissatisfied with the election results, they still could have sought invalidation of the election through the Secretary of Labor. Meanwhile, however, at least every member would have received a ballot and would have had an equal opportunity to vote.

ate attorneys' fees. In *Toth v. United Automobile, Aerospace and Agricultural Implement Workers of America*, 743 F.2d 398 (6th Cir.1984), which prompted consideration of the present jurisdictional issue, the court reversed a district court which had awarded attorneys' fees against entities that were not even parties to the lawsuit or settlement. The Sixth Circuit found that since Article III limits federal jurisdiction to "cases" and "controversies," the court only has jurisdiction to order recovery from a party to the lawsuit. The appellate court concluded that any award, including an award of attorneys' fees, "had to be grounded in *subject-matter* jurisdiction over an Article III case or controversy between Toth and the source of that recovery." *Id.* at 405 (original emphasis). The *Toth* court therefore concluded that the district court "lacked the *necessary jurisdiction* to award attorneys fees against [the non-parties]." *Id.* (emphasis added).

In the instant case, although this court may not have had jurisdiction to award all of the relief requested by plaintiffs, the court has concluded that it would have had jurisdiction to grant a significant part of the relief requested, that ballots be sent to the home address of members who had not received one. Therefore, the court finds that it now has the "necessary jurisdiction" to award any appropriate attorneys' fees against defendants in this lawsuit.

For the foregoing reasons, upon reconsideration, the court reaffirms the conclusion reached in its ruling of October 29, 1984 that this court has jurisdiction to pass on plaintiffs' application for attorneys' fees.

## II.

Governed by the rulings herein made, counsel are directed to meet to negotiate and attempt to finally resolve any further disputes concerning the fees of plaintiffs' counsel. The court will set an oral hearing to adjudicate any outstanding disputes only if those negotiations remain unsuccessful after counsel have fully exhausted all efforts to reach a compromise.

IT IS SO ORDERED.

## ON MOTION FOR ATTORNEY FEES

By motion for attorney's fees filed October 19, 1983, plaintiffs seek fees from defendant Great Lakes Seamen's Union, Local 5000, USW (hereafter Local 5000) for their attorneys Theodore E. Meckler and Daniel E. Clifton for services rendered in connection with the first and second claims of plaintiffs' six-claim complaint. Both the first and second claims are based on 29 U.S.C. § 411(a)(1). The third and fourth claims are similar to the first and second claims, but not based on section 411(a)(1). These latter claims are based on Local 5000's By-Laws and Election Manual. No attorney's fees are sought for services rendered by plaintiffs' counsel in connection with amended claims one through four, part of an amended complaint filed April 8, 1981, which were the subject of an April 1981 preliminary injunction hearing.[1]

In their first claim for relief, plaintiffs stated that in May, June and July 1980, written notice of nominations and elections for officers of Local 5000 was sent to every vessel on which Local 5000 members were employed. Because they were not on board a vessel in May or June 1980, plaintiffs state they were not informed that nominations would take place. They stated that

[n]either Penocvich, Hale, nor any other member of Local 5000 who was not serving on board a vessel in May or June 1980, was given the opportunity to nominate anyone to be a candidate for any office in the Local 5000 elections.

---

1. This court's denial on April 13, 1981 of a preliminary injunction to stop a March-April 1981 ongoing election of Local 5000, being held pursuant to revised election procedures, was affirmed on appeal, *Taylor v. Great Lakes Seamen's Union, Local 5000*, 701 F.2d 590 (6th Cir. 1983).

Pursuant to a conference call with counsel on October 18, 1985, plaintiffs have dismissed with prejudice all claims in their complaint and amended complaint, while preserving their rights to prosecute their application for attorney fees.

Plaintiffs then alleged that Penocvich, Hale and the class which they represent "have been discriminated against in their right to nominate candidates by virtue of defendants' actions and omissions, a right which was afforded to union members who were employed during May and June, 1980." Thus, they claimed that the members of the class they represented were deprived by defendants of their equal rights within Local 5000 to nominate candidates for office, in violation of section 101(a)(1) of LMRDA, 29 U.S.C. § 411(a)(1).

In their second claim for relief, plaintiffs alleged that "pursuant to voting instructions sent to the vessels ... the ballots are to be returned to the Local 5000 office in Cleveland, Ohio, not later than August 11, 1980" and that "all voting is to take place on board the said vessels." Plaintiffs stated that "[n]o notice of the election and no ballots had been sent to the home addresses of Penocvich, Hale or Taylor or any of the approximately 800 members of Local 5000 who are not serving on board a vessel during July and August, 1980."

Plaintiffs further alleged that no provision for balloting was made to accommodate members of Local 5000 "who are not serving on board a vessel." They stated that Taylor and other members of Local 5000 had sent communications to Local 5000, "requesting the right to vote in the election of officers" but "defendants have taken no affirmative action in response to said communications other than acknowledging receipt of same."

Plaintiffs Taylor, Penocvich and Hale and the class which they represent then alleged that they "have been discriminated against in their right to vote as the result of defendants' actions and omissions, which right has been afforded the union members who were employed during July and August, 1980." They stated that as a result of these actions and omissions, plaintiffs have been deprived "of their rights within the Union to vote in elections of said labor organizations in violation of section 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1)."

The complaint, together with a motion for temporary restraining order and request for preliminary injunction, were filed on July 25, 1980. Among other things, plaintiffs asserted that "the election for local union office was scheduled to be held from some time in July, 1980 until no later than August 11, 1980." Plaintiffs asked that the defendants be enjoined from "[h]olding elections for officers of Local 5000, until notices of nominations and election are sent to the home address of every member; and all members in good standing are afforded an equal opportunity to nominate candidates to run for office; and all members in good standing are afforded an equal opportunity to vote in the election of officers of Local 5000."

The court conducted a telephone conference hearing on July 25, 1980 involving the court, attorney Theodore E. Meckler for the plaintiffs, and attorney Melvin S. Schwarzwald for the defendants. The court denied plaintiffs' motion for a temporary restraining order but set the case for a preliminary injunction hearing on August 7, 1980.

At the outset of the court hearing of August 7, 1980, defendant Local's counsel announced that the ongoing election was being stopped, the ballots would not be counted, and the entire election would be rerun beginning with the nomination procedure. Defendant Local's counsel also indicated that a new procedure was going to be undertaken. The court directed defendants to submit progress reports to opposing counsel and the court. The court retained the option "to set another hearing." Thereafter, seven reports were submitted regarding adoption of new election procedures, the last on April 1, 1981. On December 18, 1980, the International Executive Board of the United Steel Workers of America adopted by-law amendments for Local 5000. The eligibility requirements to run for a local union office were relaxed. Procedures for nominations and elections were revised. As the International Union put it, "a new system ... will call for the use of the mail ballot for both nominations and elections."

Plaintiffs' attorney Meckler seeks $12,-978 for 144.20 hours of legal services rendered from June 18, 1980 through July 18, 1985, calculated at $90.00 an hour, and additional fees for services since July 18, 1985. Auditing Meckler's sub-total of 71.-70 hours for the period June 18, 1980 through October 4, 1983, the court finds his time sheets show this sub-total should actually be 61.2 hours. Hence, his grand total through July 18, 1985 should be 133.70 hours rather than 144.20 hours. Of the total hours, 44.75 hours represent time spent from June 18, 1980 through February 4, 1981. Attorney Meckler attributes these hours to services rendered in connection with the first two counts of the complaint. The remaining 88.95 hours represents time which he says he has spent in prosecuting his application for fees. Daniel E. Clifton seeks $3,487.50 for 38.75 hours of legal services which he asserts were rendered from June 12, 1980 through February 5, 1981 in connection with the first two claims of the complaint. Since July 18, 1985 (including the hearing of July 22 and September 24), attorney Meckler expended 24.35 hours in seeking fees.[2]

Local 5000 continues its objection to this court's jurisdiction to award any fees in this matter to plaintiffs' counsel. While this court has denied Local 5000's jurisdiction arguments in its memoranda of October 29, 1984 and November 29, 1984, the jurisdictional objection to an award of fees is presently pertinent and will be considered along with other objections of Local 5000.

In the concluding paragraph of this court's November 29, 1984 memorandum, this court directed counsel "to meet to negotiate and attempt to finally resolve any further disputes concerning the fees of plaintiffs' counsel." The court indicated that an oral hearing would be set if those negotiations remained unsuccessful after the full exhaustion of efforts to reach a compromise. When those efforts proved unproductive, the court held hearings in the application for fees of plaintiffs' counsel on July 22, 1985 and September 24, 1985. Based on the record and the evidence received at these hearings, the court will now rule on plaintiffs' request for attorney's fees.

## I.

### A.

■ Although there is no express statutory provision in the LMRDA authorizing an attorney's fees award, in *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Supreme Court held that a successful plaintiff in an action brought to vindicate rights under Title I of the Labor Management Reporting and Disclosure Act (LMRDA) may recover attorney's fees under the common benefit doctrine recognized in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). That doctrine applies when the litigation confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." *Hall*, 412 U.S. at 5, 93 S.Ct. at 1946 (quoting *Mills*, 396 U.S. at 393–94, 90 S.Ct. at 626–27.)

The summary of claims one and two of their complaint, *supra*, shows that plaintiffs sought to vindicate rights under Title I of the LMRDA for the benefit of the class of unemployed seamen members. Thus, they sought to benefit an "ascertainable class" within the meaning of *Hall v. Cole, supra*.

Plaintiffs' first paragraph of requested relief was directed to their first claim regarding the right to receive notice of nominations, and the right to nominate candidates. This court has subject matter jurisdiction under section 102 of Title I of the LMRDA, 29 U.S.C. § 412, to hear and determine a claim of violation of the guarantee in section 101(a)(1) of Title I, 29 U.S.C.

---

2. The total of 24.35 hours represents Meckler's time sheet computations of hours, starting with 10.5 hours for the hearing of July 22, less time spent on the unrelated issue of a motion for production of documents. To Meckler's total, the court has added 5.25 hours for the hearing of September 24.

§ 411(a)(1), of "equal rights and privileges within [a labor organization] to nominate candidates" and "to vote in elections ... of the labor organization." But while Local 5000's election was in progress from July 25, 1980, when the Taylor action was filed, and until the election was called off on August 7, 1980, this court would not have had jurisdiction under the first claim to enjoin the continuation of the election to give the class of unemployed members of Local 5000 an opportunity to exercise their "rights and privileges ... to nominate candidates." This is the general teaching of *Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers v. Crowley*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). Yet, *Crowley* specifically recognized a district court's Title I (section 101(a)(1)) jurisdiction to "order the union to forward ballots" to the home address of members who had not yet received one "before the completion of the election." As this court held on November 29, 1984 with reference to the jurisdiction it possessed:

> [T]his suit properly alleged certain Title I violations which would have been "easily remediable ... without substantially delaying or invalidating the ongoing election." [Footnote omitted.] *Crowley*, 104 S.Ct. at 2568–69.

■ Defendants argued at the recent hearings that even if this court had ordered more ballots, the Secretary of Labor still might have set the election aside. This may have occurred, although it cannot be said that this inevitably would have happened. In note 6 on page 12 of its November 29, 1984 memorandum and order, this court recognized that the plaintiffs, if "dissatisfied with the election results ... could have sought invalidation of the election through the Secretary of Labor." On the other hand, the plaintiffs could have waived their objections to the failure of Local 5000 to send to all members notice of the right to nominate candidates to run in the election. The plaintiffs could have opted for the partial remedy of an injunctive order that would have delayed the counting of ballots until election ballots were for-warded to the home address of members who had not received ballots. Hence, between July 25 and August 7, 1980, this court did have jurisdiction to hear and determine claim two of the complaint, contrary to the contention of Local 5000. Moreover, while this court lacked jurisdiction to halt an ongoing election, once the election was called off on August 7, 1980, this court had jurisdiction under Title I to insure that any revised election procedure met the "equal rights" guarantees of section 101(a)(1). This would be true both as to the right of all members of Local 5000 to receive notice of and to nominate candidates for Local offices and as to their right to vote in elections for the Local's officers. Therefore, this court had jurisdiction after August 7, 1980 to require Local 5000 to notify, by periodic reports, the progress being made in achieving a revised election procedure.

## B.

Given this court's jurisdiction from July 25, 1980 to August 8, 1980 over claim two, and after the election was called off on August 7, 1980 over both claims one and two, the court may award fees to plaintiffs' counsel under *Hall v. Cole*, 412 U.S. at 5, 93 S.Ct. at 1946, to the extent the litigation conferred "a substantial benefit" on the class. The *Hall v. Cole* test for an award of attorney's fees in a common benefit case, is not unlike the Supreme Court's articulation of the "threshold determination" under 42 U.S.C. § 1988 for considering when a plaintiff, as the prevailing party, may be awarded attorney fees. In *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), the Court chose as a "typical formulation" this language from *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978): "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."

Appearing at the preliminary injunction hearing of August 7, 1980 as the "representative of the defendants in this case,"

Mr. Rock advised the court that "the determination has been made that the election which has been conducted in the case among the membership of Local 5000 is being stopped." He further stated that the "ballots are not going to be counted, and the entire election will be rerun beginning at the earliest point; that is, with the nomination procedure...." While he stated that "we have decided voluntarily to do this," his statement was immediately rejected by plaintiffs' counsel.[3] While the recorded events of the August 7, 1980 hearing make it clear to this court that it was the lawsuit and the impending preliminary injunction hearing that brought about the stopping of the election, the testimony of associate general counsel English corroborates that fact. At the September 24, 1985 hearing he testified that he was alerted to the Taylor lawsuit a few days before he left for the Los Angeles International convention. When he got the pleadings, probably in Los Angeles, and after he received the Local's by-laws, he concluded that *"we should not contest the lawsuit."* (Emphasis added.) This decision was communicated to Mr. Rock's firm, which represents both the International Union and Local 5000.

■ Thus the record discloses, and this court finds, that the bringing of the Taylor lawsuit and the impending August 7, 1980 preliminary injunction hearing caused Local 5000 to stop the election. Since the decision to stop the election aborted an election unparticipated in by plaintiffs and the class of unemployed members of Local 5000 whom they represented, it is manifest that the bringing of the Taylor lawsuit conferred a common benefit to that class of which the plaintiffs were members.

As note 1 indicates, plaintiffs' claims have been dismissed with prejudice. Defendants argue that "an award of attorney's fees can only be made following an order, consent decree, or judgment" and that "[w]ithout some form of *judicial ac-*

tion, there is no justification for an award of attorney's fees." However, *Othen v. Ann Arbor School Board*, 699 F.2d 309, 313 (6th Cir.1983), contradicts such conclusion. While first noting that success "on a significant issue as a result of an agreed settlement or a consent decree ... is sufficient to support an award of attorney's fees," the court then held:

> A plaintiff may also qualify as the prevailing party if his lawsuit is found to be the "catalyst" which causes the defendant to make significant changes in its past practices, though no direct relief is obtained. *Smith v. University of North Carolina*, 632 F.2d 316, 346–47 (4th Cir. 1980): *Nadeau v. Helgemoe, supra*, 581 F.2d at 279.

The *Othen* court therefore ruled that "[a] plaintiff who voluntarily dismisses the entire action except for a request for an allowance of fees cannot be considered the prevailing party unless he can demonstrate that substantial results were achieved by the lawsuit." 699 F.2d at 313.

### C.

Defendants additionally argue that plaintiffs do not qualify as a prevailing party because the suit was unnecessary.

Defendants rely on testimony of associate general counsel English. He testified to the effect that if before the lawsuit was filed he had been presented with the same question that he considered after the lawsuit was filed, he would "have reacted the same way." Local 5000 thus contends that without filing a lawsuit, plaintiffs, by a telephone call to associate general counsel English or by a communication to the International Union executive board, would have accomplished cessation of the election and the changed nomination and ballot procedures that were eventually adopted.

■ The court need not consider what, if any, weight should be given to the view of

---

**3.** Mr. Meckler stated:

I think the compulsion of this lawsuit and the fact that a preliminary injunction hearing was set for this morning, and a decision really didn't come down to so-called "voluntarily"

make this gesture until the eleventh hour, as it were, late yesterday afternoon; and to characterize this kind of decision as voluntary I think sort of strays from the reality of the situation.

Mr. English as to what he would have done before the lawsuit was filed.[4] The court concludes that it was not necessary for plaintiffs to contact the International Union before suing Local 5000.[5] Moreover, since plaintiffs had not sued the International Union, there was no duty to exhaust intra-International Union remedies by notifying the International Union before filing suit.

Notwithstanding the testimony of associate general counsel English, the fact remains that without avail, plaintiffs did notify Local 5000 and its president, before the lawsuit was filed against these parties. The record discloses that plaintiff Mark Taylor gave full notice to Local 5000 of his concern about unemployed Local members not being permitted to vote because they were not on shipboard. Thus, he sent a letter on July 14, 1980 to defendant Danny Lee Lupu, president of Local 5000, which stated:

> The E.J. Block and two other Inland Steel boats will be laying up around the end of this week. It is likely, therefore, that as many as one half of the members of Inland Steel Fleet will not be afforded the opportunity to vote in our upcoming local elections.

Continuing, he proposed a means to get ballots to all members:

> Needless to say, I and many of my co-workers at Inland would like to vote. Some arrangement should be made for those sailors who, although unemployed, are otherwise eligible to vote. Perhaps a mail ballot could be sent to our homes. Please let me know what you come up

with soon, as the elections are only a few weeks away.

Although ballots were to be counted beginning August 12, 1980, the only response Taylor received prior to filing suit was a letter from Lupu dated July 16, 1980 stating, "I received your certified letter dated June 14, 1980 (*sic*) and note your comments." Such an uncommunicative response warranted plaintiffs in thinking that no relief could be obtained short of filing a suit. It is concluded that the suit against Local 5000 was not unnecessary.

### D.

Upon the foregoing grounds and for the reasons stated, the court determines that this lawsuit acted as a catalyst to produce the decision of Local 5000 and the International Union to stop the ongoing election. In stopping the ongoing election, the plaintiffs, by bringing this lawsuit, qualify as the prevailing party. Thus, this litigation conferred a "substantial benefit on the members of an ascertainable class," *i.e.*, the unemployed members of Local 5000.

Also, all members of Local 5000, unemployed and employed, achieved a common benefit through the revised election procedures thereafter approved and adopted as part of Local 5000's by-laws. These procedures insured their right to receive notice, to nominate candidates and to vote in the Local's elections. This reinforces the conclusion that plaintiffs, by filing their lawsuit, qualify as prevailing parties.

### II.

As noted, plaintiffs may recover attorney's fees in this case under the common

---

**4.** Presumably he formulated this view after the filing of the Taylor lawsuit and the pendency of the present fee application is bound to have influenced his thinking.

**5.** In contrast to the present case, *Mezo v. United Steelworkers*, 558 F.2d 1280 (7th Cir.1977), on which defendants rely, involved a suit against the International Union. There, the filing of the *Mezo* lawsuit was ruled unnecessary on wholly different facts. Plaintiff, a union member, had published an article criticizing union fund expenditures, and the local president had filed charges against the plaintiff under the local's bylaws. Plaintiff Mezo retained an attorney who discussed the matter with an administrator who had been appointed by the International to

"take charge of the affairs of the local." *Id.* at 1281. The administrator informed plaintiff's attorney that the charges against Mezo would be dropped. *Id.* Nevertheless, plaintiff's attorney proceeded to file suit. No hearing was ever held on plaintiff's motion for a preliminary injunction, the charges were later withdrawn, and the district court determined the case was moot, except for the attorney's fees issue. *Id.*

The appellate court accepted the district court's finding that it was unnecessary to file that action as "not clearly erroneous," but reversed a fee award because "[f]ees may not be allowed ... when it was unnecessary to file the litigation at all." *Id.* at 1283.

benefit doctrine as applied to Title I suits in *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). After noting the traditional American rule which "ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization," 412 U.S. at 4, 93 S.Ct. at 1945, the Court went on to apply to *Landrum-Griffin* cases the exception "involv[ing] cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.' *Mills v. Electric Auto-Lite,* [396 U.S. 375, 393–94, 90 S.Ct. 616, 626–27, 24 L.Ed.2d 593 (1970)]." 412 U.S. at 5, 93 S.Ct. at 1946. *Mills* recognized that common benefit cases are an outgrowth of common fund cases:

> Although the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved a "common fund" for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses.

396 U.S. at 392, 90 S.Ct. at 625.

In "common fund" cases, services performed in connection with a fee application benefit the attorney but do not benefit the fund, "they do not create, increase, protect or preserve it," and hence "there should be no attorneys' fee award from the fund for those services." *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 111 (3rd Cir.1976). However, in statutory fee cases, the same circuit recognizes that "the time expended by attorneys in obtaining a reasonable fee is justifiably included in the attorneys' fee application, and in the court's fee award," *Prandini v. National Tea Co.,* 585 F.2d 47, 53 (3rd Cir.1978).

In *Pawlak v. Greenawalt,* 713 F.2d 972, 980–84 (3rd Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984), the Third Circuit distinguished common benefit actions from common fund actions and held that under the former theory attorney's fees may be awarded for time spent in fee litigation. The court reasoned that under the common benefit theory, unlike the common fund theory,

> [t]he creation or preservation of the fund is not the justification for the fee award; rather, as in a Title VII action it is the vindication of the class' statutory rights that is the common benefit conferred on the class that justified an award of attorneys' fees.

*Id.* at 983. The *Pawlak* court also noted "an important policy consideration" for allowing compensation for fee litigation. *Id.* If not allowed compensation, the attorney's effective rates in these cases will be correspondingly reduced, which may discourage attorneys from taking these cases. *Id.* This would be contrary to the purpose of encouraging attorneys to vindicate civil rights which underlies attorney fee provisions in civil rights statutes and common benefit actions brought to vindicate rights conferred by Title I of the LMRDA. *Id.* at 984.

As in *Pawlak,* this court similarly concludes that attorney's fees may be awarded for time spent litigating the fee issue in this case. In addition to the reasons explained by the court in *Pawlak,* this result would also have the benefit of encouraging settlement of fee applications. The Supreme Court in *Hensley* emphasized that "a request for attorney's fees should not result in a second major litigation." 461 U.S. at 437, 103 S.Ct. at 1941. If attorney's fees could not be awarded for fee litigation, there would be little incentive to settle the fee claim and more reason to turn the fee issue into major litigation. Indeed, the fee application in the instant case has become a "second major litigation." This is the court's fifth written opinion relating to plaintiff's fee application.

## III.

### A.

Once it is determined that the plaintiff is a prevailing party, the court proceeds to cross this "statutory threshold" to deter-

mine "the number of hours reasonably expended on the litigation." With reference to the 44.75 hours that Mr. Meckler's billing records indicate that he spent from June 18, 1980 through February 4, 1981, 3.60 hours will be subtracted. On a copy of his time sheet for 1980, he deducts 3.60 hours for time spent on other issues. As adjusted, the total for the period from June 18, 1980 through February 4, 1981 is 41.15 hours.

*Hensley* directs that "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." 461 U.S. at 434, 103 S.Ct. at 1939. The court notes that as revised, attorney Meckler records a total of 5.40 hours in preparation of pleadings. Dealing with the same subject (drafting and revising complaint and affidavit), attorney Daniel Clifton's time sheet records five hours on July 18, 1980, two hours on July 19, 1980, and 2.3 hours on July 21, 1980. Since the dates on which attorney Clifton spent time drafting the complaint are not the same as but precede the days on which attorney Meckler lists time preparation of pleadings, the court must assume that either each counsel acted independently of the other or attorney Clifton prepared pleadings and forwarded them to attorney Meckler, who then worked on the same pleadings. In any event, it appears that in the absence of explanation, there is duplication. Therefore, one hour will be deducted from the billing time of each counsel. Otherwise, it is concluded that the time listed by each counsel for services rendered in litigating plaintiffs' claims one and two of the original complaint from June 1980 through February 4, 1981 has been reasonably expended. Mr. Meckler's adjusted total for this period is 40.15 hours, and Mr. Clifton's adjusted total is 37.25.

Meckler's prosecution of the request for fees for himself and Clifton has covered the period from November 24, 1981 through September 24, 1985. For these services he has expended 130.30 hours.[6] It is determined that these hours were reasonably expended. In toto, he has reasonably expended 153.45 hours.

### B.

The court now undertakes to fix a reasonable hourly rate for each attorney. Each counsel has asserted $90 an hour as a reasonable rate.

Attorney Meckler testified that he generally bills clients at the rate of $75 to $100 an hour. He added that in the past he has gone as low as $50 an hour. At defendants' request, Mr. Meckler prepared a schedule of the hourly rate cases in which he had been involved. Twenty-eight cases are listed covering the period from 1980 through 1985.

In 16 cases he has billed $75 an hour, and he has been paid that rate in nine cases. In four cases he has billed $50 an hour, and he has been paid that rate in two cases. In one case he has billed $60 an hour, and in two cases he has been paid that rate. In three cases he has billed $65 an hour and has been paid that rate in three cases. Thus, in 24 out of the 28 cases, he has billed $75 or less. Of those cases, $75 is the predominant rate that he has been paid.

In the four remaining cases in which Mr. Meckler has billed clients, he billed one client $90 an hour but has not been paid a fee. In two cases he has billed $100 an hour. He was paid $100 in one case, and in the other case the court has yet to award fees. In one other case he has billed $125 an hour, and the court has not yet awarded fees.

Plaintiffs called two attorneys to testify about hourly rates which they have charged. One indicated that to her knowledge attorneys with two to two and one-half years of experience bill at $75 an hour. Most attorneys with whom she works bill

---

**6.** This includes 88.95 hours from November 24, 1981 through July 18, 1985 and 24.35 hours

thereafter.

between $85 to $100 an hour. In civil rights cases involving sex, race or age discrimination, she asks for an initial retainer of $200 to $500, and afterwards bills at the rate of $75 an hour.

Plaintiffs submit a study of hourly rates, part of a law firm economics survey, published by the Ohio State Bar Association Report, July 2, 1984. For lawyers admitted to the bar in 1974 (attorney Meckler was admitted in 1975), the study shows an average of all the rates reported of $99 an hour. Insurance defense median hour rates for partners was $76 an hour, and the rate for all other types of non-insurance work was $100 an hour.

Counsel for United Steelworkers had a billing rate of $50 an hour until November 1984 when the rate was increased to $75 an hour. As brought out at the hearing, certainty that the attorney would be compensated for services rendered to the International Union helps to explain why the International Union historically pays hourly rates which may be lower than a prevailing market rate for litigators.

■ *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), held that attorneys for a non-profit law firm should receive fees based on the "prevailing market rates in the relevant community," rather than on the cost of providing a legal service. *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 13 (D.C.Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985), while agreeing that the ultimate measure of the reasonableness of an hourly rate should be the "market rate," holds that for attorney's fees under section 1988 for a "for-profit" firm, "the best evidence would be the hourly rates customarily charged by the [applicant] himself or by his law firm." *Id.* at 17 (quoting *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1325 (D.C.Cir.1982) (*per curiam* )). Taking into consideration the evidence bearing on his own rates and rates in the community, and also bearing in mind that the services were rendered with risk of non-payment, the court determines that $80.00 an hour is a reasonable rate for attorney Meckler.

Attorney Clifton's time sheet expenditure of 38.75 hours from June 12, 1980 through February 5, 1981 has been reduced by one hour to 37.75. Considering the data which he has submitted about rates which he has charged and for which he has been compensated, and bearing in mind in 1980 he had been practicing law for two and one-half years, largely in labor matters, the court fixes $65.00 an hour as a reasonable rate.

### IV.

### A.

Multiplying the net total hours reasonably expended by attorney Meckler (153.45) times his reasonable hourly rate ($80.00) produces the lodestar figure of $12,276.

Multiplying attorney Clifton's total hours reasonably expended (37.75) times his reasonable hourly rate ($65.00) produces the lodestar figure of $2,453.75.

### B.

*Hensley* directs that once the court calculates the product of reasonable hours times a reasonable rate, two questions must be addressed:

First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

In this case, the answers to these two questions are closely connected. Previously this court has determined that it lacked jurisdiction to enjoin the ongoing election to insure notice of nomination and rights under the first claim. The inability of the plaintiff to prevail on the first claim on July 25, 1980 and until the election was called off on August 7, 1980, is tantamount to a partial failure on that claim. The partial failure on the first claim must be considered in determining the level of success achieved by the plaintiffs in bringing their lawsuit.

The court previously has identified the common benefit that was realized by the unemployed members of Local 5000 when an election in which they had not been permitted to participate was stopped by Local 5000 and the International Union in response to plaintiffs' suit. It has also been noted that a common benefit was experienced by all members of Local 5000 when the by-laws relating to election procedures were revised and approved by the International Union's executive board.

Defendants argue that a revised election procedure could not have been ordered by this court and therefore, that the revision of the by-laws relating to election procedure was carried out voluntarily by the International Union and Local 5000. However, it is determined, as indicated, *supra*, that once the election was called off, this court did have jurisdiction under section 102 to determine whether the Local's revision of its election procedure complied with section 101(a)(1).[7] Hence, the bringing of the Taylor lawsuit and this court's monitoring of Local 5000's actions in revising its election procedure to comply with section 101(a)(1) did serve as a catalyst to bring about by-law changes that benefitted all members. Thus, plaintiffs' counsel's services through February 4, 1981 are compensable. However, bearing in mind the partial failure noted above on Count I, the court determines that plaintiffs' level of success should be fixed at 80 percent of total possible success. This 80 percent level of success is applied to the total lodestar figure of each attorney. The court thus has concluded that the 20 percent reduction is applicable not only to the hours reasonably expended in litigating plaintiffs' first two claims but equally to the hours reasonably expended in prosecut-ing the fee application. Applying the 80 percent figure to the lodestar amounts, the net sum of fees (rounded off) awarded attorney Meckler is $9,820.00. The net sum of fees awarded Daniel Clifton is $1,963.00.

### C.

In *Hall v. Cole*, the Court indicates that in a *Landrum-Griffin* common benefit case (and this case is that kind of case), one of the considerations "best addressed to the sound discretion of the District Court" is "the extent to which the payment of the plaintiff's counsel fees out of the union treasury might impair the union's ability to operate effectively." 412 U.S. at 15, n. 23, 93 S.Ct. at 1951 n. 23. Local 5000 went under administratorship some time after the 1980 events that are the subject of this application for fees. At the time the administrator took over the Local, he testified there was $800 in the Local. Because of the massive drop in Great Lakes shipping, membership in Local 5000 has markedly declined. While the administrator testified at the July 22, 1985 hearing that the union treasury contained $29,000 in cash, the administrator then checked off several uses to which those monies would be put. He estimated that the various uses will total $40,000 for the balance of the year, although he anticipated that the Local Union will receive $11,000 in dues refunds from the International Union.

In light of the foregoing precarious financial condition of the Local treasury and reduced future dues revenues, the court directs that the total fees of $11,783.00 [8] shall be paid in four equal three-month installments beginning with the first installment to be paid on November 1, 1985. This is deemed to be a "manageable payment schedule." *Donovan v. Sover-*

---

7. Taylor's letter of July 14, 1980 to President Lupu was a request that ballots be sent to the home addresses of unemployed members of Local 5000. It did not raise an objection to the failure of Local 5000 to send notices of the right to nominate candidates to those unemployed members. However, Local 5000 did not respond affirmatively to the letter. Plaintiffs were entitled to broaden their complaint to include a claim relating to their right of notice of nomination.

8. The air fare expenses of attorney Clifton are denied. While he testified as a witness at the July 22, 1985 hearing, he also served as counsel for the plaintiffs. Plaintiffs who chose to be represented by out-of-town counsel should absorb the cost of having their counsel travel to this court to represent them or to appear as a witness in their own behalf.

*eign Security, Ltd.,* 726 F.2d 55, 58 (2d Cir.1984).

IT IS SO ORDERED.